IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| USCOC OF GREATER IOWA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | 4:06CV3104 |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF OMAHA, NEBRASKA, | ) | MEMORANDUM OPINION |
| | ) | |
| Defendant. | ) | |

The plaintiff, USCOC of Greater Iowa, Inc. ("USCOC"), commenced this action against the City of Omaha, Nebraska ("the City"), seeking an injunction directing the City to issue a special use permit to USCOC to build and operate a wireless telephone transmission tower ("cell tower") at 1502 North 52nd Street, Omaha, Nebraska. USCOC alleges the City's denial of USCOC's application violated the Telecommunications Act of 1996, 47 U.S.C. § 332 *et seq.*, because the denial is not supported by substantial evidence contained in a written record, prohibits the provision of personal wireless service, and discriminates against carriers with functionally equivalent service.

A trial to the Court, sitting without a jury, was held on August 31, 2006. The Court, having considered the evidence,[1]

---

[1] At trial, the City objected to USCOC's offer of Exhibits 41, 42 and 43 into evidence. The Court reserved ruling on the admissibility of these exhibits. The Court now finds Exhibits 41, 42 and 43 are admissible. These exhibits relate to the Ibsen Site application and are relevant to the issue of whether there are alternative sites available for USCOC's cell tower. Also, the City Council made these exhibits relevant when it suggested that a three-site combination including a tower at the Ibsen Site location could provide the coverage USCOC needs. (Ex. 24; Ex. 36 at 6:23-7:10).

the briefs and arguments of counsel, and the applicable law, hereby makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

**FINDINGS OF FACT**

**I.   Ibsen Site Application**

USCOC provides commercial mobile radio services under the brand name U.S. Cellular.  It is a recent entrant into the Omaha area and is federally licensed to provide wireless service in Omaha.  USCOC is in the process of expanding coverage from its initial coverage network (Filing No. 20 (Joint Stipulation of Index of Evidence) (hereinafter "Ex. ___"), Ex. 17 at 52-53).  In response to customer complaints, USCOC's radio frequency engineers identified a coverage gap in the North Saddle Creek area.

On March 11, 2005, USCOC applied to the Omaha Planning Department (the "Planning Department") for a special use permit to build a multi-carrier sixty-nine foot silhouette pole and accompanying equipment building at the parking lot of Ibsen Costumes at 4983 Hamilton Street, Omaha, Nebraska (the "Ibsen Site").  The Ibsen site failed to gain a favorable recommendation from the Omaha Planning Department Staff (the "Planning Staff").  (Ex. 34 at 2:18-21).  The Planning Staff suggested USCOC explore campus environments in the area (Ex. 34 at 2:18-3:4; Ex. 42 at 5-7).

-2-

## II.   North Saddle Creek Site Application

### A.   Omaha Planning Board's Actions

On August 15, 2005, USCOC submitted a second application to the Planning Department for a special use permit at Greater Beth-el Temple at 1502 North 52nd Street, Omaha, Nebraska (the "North Saddle Creek Site").[2]  The North Saddle Creek Site and most of the surrounding area is zoned R-4,[3] which is a residential zoning district (Ex. 23 at 48).  USCOC proposed a single carrier seventy-foot silhouette pole designed as a light standard in the middle of the parking lot and an accompanying equipment building on the edge of the parking lot (Ex. 3 at 2378-79).

The Planning Board held four public hearings on USCOC's application for a special use permit.  USCOC provided testimony and exhibits, and proponents and opponents of the tower had the opportunity to speak.  Following the first hearing, USCOC submitted an alternative cross design for the cell tower (Ex. 37 at PC0056-58).  The Planning Staff requested USCOC change the design from a sixty-five foot silhouette pole to a seventy-five

---

[2] Deacon of Greater Beth-el Temple, Scott Miner, submitted a letter to the City expressing his support for the proposed cell tower location (Ex. 8 at 77).

[3] Omaha Municipal Code § 55-181.

-3-

foot stealth bell tower,[4] which would accommodate a second provider (Ex. 34 at 38:15-23; Ex. 22 at 1). USCOC complied with the request, and the Planning Staff then recommended that the Planning Board approve USCOC's application (Ex. 22 at 1; Ex. 37 at PC0224-246).

The Planning Board held its final hearing on February 1, 2006. Opponents spoke and submitted cards and petitions opposing the tower. Cingular Wireless ("Cingular") representative, Sam Mandolfo, spoke in favor of the tower and stated Cingular's intention to collocate on the proposed tower (Ex. 30 at 4:15-6:2). Planning Director Jensen stated that USCOC has a coverage gap in this area; multiple, shorter towers will not fill the coverage gap, no other alternatives are available; and that a bell tower is the best option, provided it is constructed out of materials similar to the existing structure (Ex. 30 at 17-20). Despite Director Jensen's statement and the Planning Staff's recommendation, the Planning Board voted 5-1 to recommend denial of the application to the Omaha City Council (Ex. 37 at PC359).

**B.   Omaha City Council's Actions**

On March 21, 2006, the Omaha City Council (the "City Council") held its first public hearing on USCOC's North Saddle

---

[4] A "stealth" tower is "[a] wireless service facility that is disguised, hidden, or integrated with an existing structure that is not a monopole or tower." (Ex. 13 ("City of Omaha Telecommunications Facility Performance Standards") at 2, ¶ III(A)).

-4-

Creek Site application (Ex. 34). USCOC submitted additional evidence, including: oral testimony; the affidavit of radio frequency engineer Patrick Armstrong; radio frequency propagation maps; drive testing data; a study on the impact of cellular towers on real property values in Lincoln, Nebraska; and emails from supporters of the proposed tower. USCOC representative, Kenneth Weber, spoke at the hearing, explaining USCOC's need for the North Saddle Creek Site tower and describing USCOC's investigation of alternative sites and designs (Ex. 34 at 1-5).

Opponents of the proposed tower spoke out against the tower, expressing concern about the location, size and aesthetics of the tower, as well as the impact on health and property values. Opponents of the tower also expressed doubt regarding the need for the tower (Ex. 34 at 5-21).

Planning Director Jensen spoke at the hearing, stating the proposed tower is an allowed miscellaneous use in a residential district with a special use permit; the City of Omaha Telecommunications Facilities Performance Standards ("Performance Standards") were merely guidelines that must yield to the requirements of the Telecommunications Act of 1996 ("TCA"); USCOC had provided more information than had been asked of any other applicant; USCOC had a gap in service; and the Planning Staff had requested the bell tower design (Ex. 34 at 36:1-39:8). The City

-5-

Council voted to lay over the application (Ex. 34 at 60:22-62:20; 65:12-15).

The City Council held a second meeting on April 4, 2006 (Ex. 36). USCOC submitted radio frequency engineering coverage plots of two-site combinations as requested by the City Council, demonstrating that USCOC had explored an additional 105 options (Ex. 8 at 81-82). USCOC also submitted evidence that due to an Omaha Public School remodeling plan, Harrison Elementary School was not a feasible location for a cell tower (Ex. 8 at 101-104).

Councilman James Suttle announced he was opposed to USCOC's application and read a prepared statement, identified as "substantial evidence," outlining his opposition (Ex. 5). The City Council then denied USCOC's application for a special use permit by a vote of 4-3 (Ex. 36 at 9-10).

In an April 6, 2006, letter, the City set forth its five reasons for denying USCOC's application (Ex. 24 at 2-4). The City substantially adopted Councilman Suttle's statement of "substantial evidence." Both USCOC and the City acknowledged at trial that the "substantial evidence" allegedly supporting the City's denial is limited to the reasons contained in this letter. The City gave the following reasons for denial: (1) "[t]he proposed commercial use is incompatible with the Single Family Residential District in which it is proposed;" (2) "[t]he alleged history of missed calls, lost calls, or citizen complaints, have

-6-

not demonstrated a justification that the placement of this broadcast tower should be granted over and above the single family residential zoning on and surrounding the site;" (3) "[t]he Applicant has within its written materials shown that alternatives may exist to a single 75-foot broadcast tower;" (4) "[t]he application does not meet six of the nine guidelines listed in the City of Omaha Telecommunications Facilities Performance Standards;" (5) "[t]his application should be denied based upon the Omaha Planning Board's vote (5-1) recommending against the special use permit for this broadcast tower, based upon their [sic] public hearing of February 1, 2006." (*Id.*).

## CONCLUSIONS OF LAW

**I.   The Telecommunications Act of 1996**

Congress enacted the Telecommunications Act of 1996 ("TCA"), Pub. L. No. 104-104, 110 Stat. 56 (codified primarily in scattered sections at 47 U.S.C.), "to promote competition and higher quality in American telecommunications services and to 'encourage the rapid deployment of new telecommunications technologies.'" *City of Rancho Palos Verdes, California v. Abrams*, 544 U.S. 113, 115 (2005). For this reason, the TCA places limitations on State and local governments' ability "to regulate the location, construction, and modification" of facilities for wireless communications. *Abrams,* 544 U.S. at 115 (citing 47 U.S.C. § 332(c)(7)).

-7-

Specifically, the TCA prohibits State or local governments from: (1) unreasonably discriminating "among providers of functionally equivalent services;" and (2) prohibiting or having "the effect of prohibiting the provision of personal wireless services."  47 U.S.C. § 332(c)(7)(B)(i)(I) and (II).

The TCA requires that:

> [a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

47 U.S.C. § 332(c)(7)(B)(iii).

Furthermore, the TCA prohibits State or local governments from regulating:

> the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

47 U.S.C. § 332(c)(7)(B)(iv).

## II.  Omaha Regulations

Chapter 55 of the Omaha Municipal Code (the "OMC") authorizes the City to regulate land use.  The proposed North Saddle Creek Site is located on property that is zoned R-4, which

-8-

is a single-family residential district.  OMC § 55-181.  In an R-4 district, a broadcast tower is permitted as a miscellaneous use, provided the City Council approves a special use permit.  OMC § 55-185.

Section 55-884 of the OMC sets forth the procedure for obtaining a special use permit for land use in an R-4 district.  Under § 55-884, the Planning Director reviews the application and transmits his recommendation to the Planning Board.  OMC § 55-884(e).  The Planning Board then reviews the application and transmits its recommendation to the City Council, which then acts on the special use permit by resolution.  OMC §§ 55-884(e),(f).  The criteria for review and evaluation of a special use permit is prescribed by § 55-885 of the OMC.

## III. Substantial Evidence

USCOC claims that the City Council's decision to deny USCOC's special use permit application is not "supported by substantial evidence contained in a written record" as required by the TCA.  47 U.S.C. § 332(c)(7)(B)(iii).  The standard of review for alleged violations of the TCA's substantial evidence requirement is the traditional standard of review for agency actions.  *USOC* [sic] *of Greater Iowa, Inc. v. City of Bellevue, Nebraska,* 279 F. Supp. 2d 1080, 1085-86 (D. Neb. 2003); *see also* H.R. Conf. Rep. No. 104-458 (1996) (stating "[t]he phrase, 'substantial evidence contained in a written record' is the

-9-

traditional standard used for judicial review of agency actions."). Under this standard, "[s]ubstantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the [agency]'s conclusion." *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). The Eighth Circuit Court of Appeals instructs courts to "consider evidence that detracts from the [agency's] decision as well as evidence that supports it." *Id.*

The City conceded that the "substantial evidence contained in a written record" is limited to the reasons stated in the City Council's April 6, 2006, letter (Ex. 24). Therefore, the Court will examine each of these reasons separately.

**A.   Compatibility with a Residential District**

The first reason the City Council cited for denying USCOC's application is that "[t]he proposed commercial use is incompatible with the Single Family Residential District in which it is proposed." (Ex. 24). As was noted at trial, the use of the term "commercial use" was in error. Under OMC § 55-185, a broadcasting tower[5] located in an R-4 district is a miscellaneous use, rather than a commercial use. The OMC permits broadcasting towers to be located in R-4 districts with a special use permit.

_____

[5] A broadcasting tower is "[a] structure for the transmission or broadcasting of radio, television, radar or microwaves, ordinarily exceeding the maximum height permitted in its zoning district. Radio towers not exceeding 50 feet in height are excluded from this definition." OMC § 55-51(a).

-10-

OMC § 55-185.  Various courts have recognized that the
requirements of the TCA will sometimes mandate that cell towers
be located in residential areas.  *See Group EMF, Inc. v. Coweta
County*, 50 F. Supp. 2d 1338, 1340-41 (N.D. Ga. 1999); *Smart SMR
of New York, Inc. v. Zoning Commission of Town of Stratford*, 995
F. Supp. 52 (D. Conn. 1998); *OPM-USA-Inc. v. Board of County
Commissioners of Brevard County*, 7 F.Supp. 2d 1316, 1324 (M.D.
Fla. 1997).  In addition, the City Council has previously
approved eighteen cell towers located in residential zoning and
four abutting residential zoning (Ex. 8 at 6-9, 44-67).

General aesthetic concerns alone cannot serve as
substantial evidence on which to base a denial.  *VoiceStream
Minneapolis, Inc. v. St. Croix County,* 342 F.3d 818, 831 (7th
Cir. 2003); *see also Bellevue*, 279 F. Supp. 2d at 1086 (stating
generalized concerns about aesthetics or property values are
NIMBY ("not in my backyard") concerns that do not constitute
substantial evidence).  Neither the City nor the tower opponents
set forth any specific aesthetic concerns unique to the proposed
North Saddle Creek Site.  USCOC submitted an appraisal of the
effect on property values near a proposed cell tower in Lincoln,
Nebraska (Ex. 19 at 13-43).  The appraisal report concluded that
there would be "no diminution of residential property values in
the vicinity" of the proposed tower (*Id.* at 14).  *See Bellevue,*
279 F. Supp. 2d at 1086 (citing the Lincoln, Nebraska appraisal

report).   There were no contrary studies or appraisals before the Court.   The Court finds that any aesthetic concerns associated with the proposed tower are precisely the type of generalized aesthetic concerns that do not constitute substantial evidence.[6]

As to the health or environmental concerns raised by tower opponents, the TCA prohibits State and local governments from regulating the placement of cell towers on the basis of the environmental effects of radio frequency emissions if the facilities comply with the Federal Communications Commission's ("FCC") regulations.   47 U.S.C. § 332(c)(7)(B)(iv).   There is no evidence suggesting USCOC's proposed tower fails to comply with these regulations.

For the above reasons, the Court finds that the City's first reason for denial does not constitute substantial evidence.

**B.    Existence of a Coverage Gap**

The second reason for denial given by the City is that 2) "[t]he alleged history of missed calls, lost calls, or citizen complaints, have not demonstrated a justification that the placement of this broadcast tower should be granted over and above the single family residential zoning on and surrounding the site." (Ex. 24).   During the application proceedings and trial,

---

[6] The City cites the Court to *VoiceStream Minneapolis, Inc. v. St. Croix County,* 342 F.3d 818 (7th Cir. 2003).  However, this case is not applicable as it involved the installation of a tower near a nationally recognized historic site and scenic riverway.

-12-

there was some discussion as to the validity of USCOC's coverage gap.  The fact that USCOC has a substantial coverage gap in the North Saddle Creek area is beyond dispute.  As demonstrated by coverage maps and drive tests, there is a 1.8 square mile gap in USCOC's coverage, extending from Lake Street to Dodge Street and from Highway 64/North Saddle Creek Road to 60th Street (Ex. 8 at 15).  There is no USCOC coverage at the center of the gap, and the surrounding area has erratic coverage only (Ex. 19 at 11,12).  This coverage gap was further demonstrated by customer complaints and dropped call statistics (Ex. 34 at 24:4-7).  Cingular Wireless reports a substantial coverage gap in this area as well (Ex. 30 at 4:15-18, Ex 37 at PC0648-660).  The Court finds the City's second reason for denial does not constitute substantial evidence.

## C.   Alternative Locations

The City's third reason for denial is that "[t]he Applicant has within its written materials shown that alternatives may exist to a single 75-foot broadcast tower."  The City Council adopted Councilman Suttle's statement that "[t]wo or three shorter towers at other sites may provide a substantial amount of the missing coverage."  (Ex. 5 at 2; Ex. 24 at 3).  Specifically, Councilman Suttle opined that a five foot antenna on top of the OHA Underwood Tower would cover the southeast portion of the coverage gap; a five foot antenna at OHA Benson

-13-

Tower would cover the north and west portions of the coverage gap; and forty-five foot monopole near the previously proposed Ibsen Site would cover a small portion of the east side of the coverage gap (Ex. 5 at 2, Ex. 24 at 3, Ex. 36 at 6:23-7:10).

The Court finds that USCOC explored all reasonable alternatives to the proposed North Saddle Creek Site. USCOC submitted the affidavit of Patrick Armstrong, a radio frequency engineer, who examined alternative sites (Ex. 19 at 2-10). In addition to examining USCOC's five existing sites, Mr. Armstrong stated that USCOC considered ten alternative collocation sites (*Id.* at 5-9). USCOC also explored 105 two-site combinations in response to a City Council request to do so (Ex. 8 at 81-82). Mr. Armstrong's affidavit states that none of these 105 two-site alternatives would provide the coverage USCOC needed due to height, location, obstruction, and/or interference issues (Ex. 19 at 5-9). USCOC was never asked to explore three-site combinations.

The City Council's three-site proposal fails to close the North Saddle Creek coverage gap, as demonstrated by an overlay of the color transparencies prepared by USCOC (Ex. 8; Filing No. 22 at 35). Furthermore, one of the three sites mentioned in the City Council's denial letter is the Ibsen Site location, which failed to gain a favorable recommendation from the Planning Staff (Ex. 24; Ex. 34 at 2:18-21; Ex. 36 at 6:23-

-14-

7:10).  The Court finds that lay opinion as to the feasibility of a three-site combination does not constitute substantial evidence.  The Court further finds that USCOC explored all reasonable alternatives to the proposed site.

     **D.   Compliance with Performance Standards**

         The fourth reason given by the City Council for denying USCOC's application is that it "does not meet six of the nine guidelines listed in the City of Omaha Telecommunications Facilities Performance Standards."  The City of Omaha Telecommunications Facilities Performance Standards ("Performance Standards") are guidelines for determining whether telecommunications facilities should be approved (Ex. 13; Ex. 34 at 37:13-18).  The Performance Standards are merely guidelines and have not been adopted by ordinance into the OMC.

         The City Council contends that USCOC's application did not meet the following Performance Standards: (1)"[e]nsuring telecommunication facilities, towers and antennas are configured in a way that minimizes adverse visual impacts . . . .;" (2) "[p]rotecting residential areas by minimizing the adverse impacts of towers, antennas and telecommunication facilities;" (3) "[e]ncouraging the location of telecommunication facilities in nonresidential areas and to minimize the visibility of such equipment from adjacent streets and neighborhoods;" (4) "[e]ncouraging the attachment of antennas to existing

-15-

structures;" (5) "[e]nsuring that telecommunication facilities, towers, and antennas are compatible with surrounding land uses and in keeping with the character of the neighborhood;" and (6)"[e]nsuring against the creation of visual blight within or along the City's scenic corridors." (Ex. 13 at 1, Ex. 24 at 3).

The Court finds that the Planning Staff recommended approval of USCOC's application after carefully considering the Performance Standards (Ex. 32 at 33:19-35:20, Ex. 34 at 37:13-38:23). At the March 21, 2006, City Council hearing, Planning Director Jensen acknowledged that this case "violates" the Performance Standards (Ex. 34 at 37:18-23). However, Jensen stated that despite this failure to meet the Performance Standards, the proposed site was the only option and the City must yield to federal law and allow USCOC to provide adequate coverage in the area (*Id*. at 38:9-23).

Section 55-885 of the OMC sets forth the criteria for review and evaluation of a special use permit. The criteria include a consideration of the height and bulk of the proposed facility. OMC § 55-885(a). In this case, the Planning Department found the proposed tower met the criteria of § 55-885, and commented that each applicable category was "acceptable." (Ex. 22 at 3-4). There is no evidence that these criteria have not been met.

-16-

The Court finds the proposed site complies with the City's ordinances. The evidence shows that the Planning Department and USCOC worked carefully to find the best location to provide the necessary coverage and to find the best structure to minimize the visual impact of the cell tower (Ex. 34 at 38:9-23). The Court finds USCOC's failure to meet the Performance Standards, given the lack of alternative locations, does not constitute substantial evidence for denying the permit.

**E.   Planning Board's Recommendation**

The final reason for denial was "[t]his application should be denied based upon the Omaha Planning Board's vote (5-1) recommending against the special use permit for this broadcast tower, based upon their public hearing of February 1, 2006." (Ex. 24 at 2-4). The Planning Board recommended the City Council deny USCOC's application; however, it was the City Council's responsibility to act on this recommendation and, in the case of a decision to deny, to set forth the reasons for that denial. The mere fact that the Planning Board recommended denial, without any evidence that the Planning Board's recommendation was based on a different reason than the reasons cited by the City, does not constitute substantial evidence.

The Court finds that the City's reasons for denial neither individually or collectively constitute substantial evidence. Accordingly, the Court finds the City's denial of

-17-

USCOC's application violates § 332(c)(7)(B)(iii) as the decision
is not "supported by substantial evidence contained in a written
record."

**IV.  Discrimination and Prohibition Claims**

        While the Court has determined the City's denial
violates the TCA because it is not supported by substantial
evidence, the Court will briefly address USCOC's discrimination
and prohibition claims.  The TCA prohibits State and local
governments from "unreasonably discriminating among providers of
functionally equivalent services" and prohibiting or having "the
effect of prohibiting the provision of personal wireless
services."  47 U.S.C. § 332(c)(7)(B)(i).  USCOC has the burden to
prove discrimination and prohibition.  *See Second Generation
Properties, L.P. v. Town of Pelham*, 313 F.3d 620, 629 (1st Cir.
2002)(stating the burden on the provider to prove effective
prohibition is a heavy one).

        A single denial of a proposed cell tower site can
demonstrate an effective prohibition of personal wireless service
"if that denial is 'shown to reflect or represent, an effective
prohibition on personal wireless service.'"  *Southwestern Bell
Mobile Systems, Inc. v. Todd*, 244 F.3d 51, 58 (1st Cir. 2001);
*Voice Stream PCS I, LLC v. City of Hillsboro*, 301 F. Supp. 2d
1251, 1260-61 (D. Or. 2004).  In order to prove there has been an
effective prohibition of service, the provider must demonstrate:

-18-

(1) a gap in coverage exists; and (2) the provider has explored all reasonable alternatives that may be a less intrusive way to fill the gap. *MetroPCS, Inc. v. City and County of San Francisco,* 400 F.3d 715, 731 (9th Cir. 2005). Effective prohibition can exist when a local government enforces criteria that are impossible for any applicant to meet or when an applicant's existing application is the only feasible plan. *Pelham,* 313 F.3d at 630.

The evidence clearly demonstrates that USCOC has met its burden of proof on these two issues. The Court finds that both USCOC and Cingular have significant coverage gaps in the North Saddle Creek area. The Court further finds that USCOC has explored all reasonable alternatives that may be less intrusive to fill the coverage gap.

It has been suggested that USCOC has failed to show that other carriers have a similar gap, but the evidence establishes that Cingular also has a similar gap in coverage. In any event, allowing a city to deny a carrier's application to build a tower merely because other carriers have coverage in that particular area would give cities the right to discriminate against providers. That is something the TCA does not allow. 47 U.S.C. § 332(c)(7)(B)(i)(I). This finding of the Court further supports the Court's conclusion that the city should be ordered to grant plaintiff's application.

-19-

**V.    Remedy**

The Court finds the appropriate remedy for the City's violations of the TCA is to issue injunctive relief to USCOC. *See Bellevue,* 279 F. Supp. 2d at 1088; *New Par v. City of Saginaw,* 301 F.3d 390, 399-400 (6th Cir. 2002); *Preferred Sites, LLC v. Troup County*, 296 F.3d 1210, 1222 (11th Cir. 2002); *National Tower, LLC v. Plainville Zoning Board of Appeals*, 297 F.3d 14, 21-22 (1st Cir. 2002); *Omnipoint Corp. v. Zoning Hearing Board of Pine Grove Township,* 181 F.3d 403, 410 (3d Cir. 1999); *Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 497 (2d Cir. 1999)(determining injunctive relief was the appropriate remedy for violations of the TCA).  A separate order will be entered in accordance with this memorandum opinion.

DATED this 14th day of September, 2006.

BY THE COURT:

/s/ Lyle E. Strom

_____
LYLE E. STROM, Senior Judge
United States District Court

-20-